ams/ajc

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| MANORAMA PATEL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 07-2290-JAR |
| ) | |
| UNIVERSITY OF KANSAS ) | |
| HOSPITAL AUTHORITY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM AND ORDER GRANTING
## MOTION FOR SUMMARY JUDGMENT

Plaintiff Manorama Patel brings this action alleging discrimination on the basis of race and national origin under Title VII of the Civil Rights Act of 1964 ("Title VII")[1] and 42 U.S.C. § 1981, and retaliation under Title VII. This matter comes before the Court on defendant's Motion for Summary Judgment (Doc. 31). The motion is fully briefed and the Court is prepared to rule. For the reasons stated below, defendant's summary judgment motion is granted.

**I.  Summary Judgment Standards**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[2] A fact is only material under this standard if a dispute over it would affect the outcome

---

[1] 42 U.S.C. § 2000e.

[2] FED. R. CIV. P. 56(c).

Case 2:07-cv-02290-JAR   Document 39   Filed 12/08/08   Page 2 of 15

of the suit.³  An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."⁴  The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."⁵

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.⁶  Where, as here, the moving party does not bear the burden of persuasion at trial, it may satisfy this burden by showing "a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."⁷  When examining the underlying facts of the case, the Court is cognizant that it may not make credibility determinations or weigh the evidence.⁸  Furthermore, the record is to be viewed in the light most favorable to the nonmoving party.⁹

## II.  Uncontroverted Facts

The following facts are either uncontroverted, stipulated to, or taken in the light most favorable to plaintiff.  Plaintiff, who is of South Asian heritage and has dark skin, was employed on a probationary basis as a Gastrointestinal/Endoscopy Lab Technician ("GI Tech") by the University of Kansas Hospital Authority ("Hospital") beginning on July 5, 2006.  During her employment, plaintiff was supervised by Denise Schuttig and Brad Peck, with David Wyatt

---

³*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

⁴*Id.*

⁵*Id.* at 251–52.

⁶*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

⁷*Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008).

⁸*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

⁹*Harrison v. Wahatoyas, LLC*, 253 F.3d 552, 557 (10th Cir. 2001).

2

serving as her Department Director. Shortly after being hired, plaintiff attended a new-employee orientation, where she received instruction on the Hospital's commitment to diversity and ways to overcome cultural differences. Also during this orientation, plaintiff received the Hospital's Human Resources Policy Manual, which she later read.

Plaintiff also received instruction on the Hospital's discrimination and harassment policies, including methods for complaining about discrimination and harassment. Under this policy, the Hospital's complaint procedure requires an employee to report any suspected discrimination or harassment to either their department director, the Human Resources Manager, or the Vice President of Human Resources. The Hospital's policy further provides that employees making good-faith reports of discrimination or harassment will not be retaliated against.

The Hospital's Employee Conduct and Corrective Action Policy requires employees generally to "use their best efforts while at work, and to comply with the policies set forth in [the] manual."[10] As part of her professional duties, plaintiff was responsible for preparing medical equipment, arranging the lab for upcoming procedures, and providing doctors with equipment during procedures. As plaintiff knew, GI Techs are required to stand next to the doctor or Registered Nurse ("RN") for the procedure's duration, where they are to provide assistance and respond to contingencies. Specifically, during Cholangiopancreatography procedures ("ERCP procedures" or "ERCPs"), GI Techs stand behind the RN assisting the doctor, provide them with instruments, and perform any other tasks as directed by the RN or doctor.

---

[10](Doc. 32, Ex. G.)

On December 14, 2006, plaintiff served as the GI Tech for an ERCP procedure assisted by two RNs: Dianne Darrah and Dave Bohling. Initially, plaintiff assisted Bohling by handing him wires as the physicians requested them. At some point after the procedure began, Darrah asked to take over for plaintiff. Thereafter, Darrah provided the equipment to Bohling and plaintiff was only required to provide equipment if it was needed from a cart outside the procedure area.

With little space to stand behind the RN—and believing herself to be on break—plaintiff decided on her own to enter a side area, which contained a window into the procedure room. Remaining there for over an hour, plaintiff both stood and sat intermittently but did nothing more to assist with the procedure. Moreover, feeling tired, plaintiff may have dropped her chin while sitting, though she denies having fallen asleep. Through the window, both Darrah and Bohling observed plaintiff sleeping, though neither elected to try and wake her. Darrah estimated that plaintiff slept for a period of twenty minutes; Bohling estimated that she slept for ten to fifteen minutes. Darrah and Bohling continued to perform plaintiff's GI Tech duties.

The following morning, Bohling reported to Schuttig that he observed plaintiff sleeping during the ERCP procedure the day before. Later, after Darrah corroborated Bohling's report, Schuttig discussed the incident with Wyatt and Eileen Stanton, the Hospital's Employee Relations Coordinator. Subsequently, Schuttig placed plaintiff on administrative leave pending an investigation of the incident. The investigation entailed obtaining written statements from Bohling and Darrah about their observations during the ERCP procedure. Following the investigation, plaintiff was called to a meeting with Schuttig and Stanton during which she was terminated for sleeping during a medical procedure.

Schuttig, Stanton and plaintiff all signed a Corrective Action Form explaining that multiple witnesses reported that plaintiff fell asleep during an ERCP procedure on December 14, 2006, and that such behavior violated her duties as a GI Tech and could have resulted in an adverse patient outcome.[11] Moreover, the form states that plaintiff's actions violated the Employee Conduct and Corrective Action policy requiring employees to use their best efforts while at work and to comply with Hospital policies. It states that the consequence for violating this policy and failing to meet the expectations for her job description is termination, effective December 19, 2006. Neither Bohling nor Darrah were disciplined for failing to wake plaintiff up during the December 14, 2006 ERCP procedure.

Prior to the December 14, 2006 incident, plaintiff alleged that a physician, Dr. Cooke, discriminated against her on two different occasions. Dr. Cooke was not employed by the Hospital, but by KUPI, an unaffiliated entity that enjoys privileges at the Hospital. In the first instance, plaintiff recalls that while cleaning a room, she overheard Dr. Cooke—outside in the hallway—tell another doctor that he hated "Indians and Pakistanis." Plaintiff testified that one or two weeks after this first incident, on December 8, 2006, Dr. Cooke asked her for an instrument during a medical procedure; one that could only be provided by an RN. Because the RN was busy and had told her to wait, plaintiff did not provide the instrument. In response, Dr. Cooke yelled at her, saying "Are you stupid? Are you deaf?" Plaintiff replied she was waiting for the nurse to provide the instrument, after which, the procedure continued without incident.

Following this second incident, plaintiff met with Schuttig and told her about the insulting comments she received during the medical procedure. At Schuttig's request, plaintiff

---

[11](Doc. 32, Ex. M.)

documented her complaint in an email to Stanton in Human Resources:

> Here is my side of the story regarding incident that happened on Friday, 12/8. I was in the room with one of the Nurse Kathy Yonker with Dr. Cooke. During the procedure he asked for a Biopsy forcep while the nurse was giving meds to the patient. As a GI Tech I have no access to the biopsy forcep, it is kept in the Nurses [sic] cabinet. So I was waiting for Kathy RN to get the forcep. Then Dr. Cooke shouted at me and said. Are you stupid! Are you deaf! I want biopsy forsep. And Dr. Cooke was given the forcep and the case finished. There were no apologies.

Plaintiff testified that Dr. Cooke looked at her in an unkind manner, which she found offensive but not discriminatory. Plaintiff also described how Dr. Cooke once wrote something on a board, which he said was directed toward her. Plaintiff contended it was written in a language she did not understand and was unsure whether it was meant as a joke or insult.

## III. Discussion

Plaintiff alleges discrimination and retaliation claims under Title VII and 42 U.S.C. § 1981. Title VII makes it an unlawful practice for an employer "to discharge any individual . . . because of such individual's race, color . . . or national origin."[12] An employer is not allowed to "discriminate against any of his employees" because the employee opposed an illegal employment practice, as designated by Title VII.[13] Section 1981, as amended by the Civil Rights Act of 1981, states:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit off all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and

---

[12] 42 U.S.C. § 2000e-2(a)(1).

[13] 42 U.S.C. § 2000e-3(a).

exactions of every kind, and to no other.[14]

In the employment discrimination context, claims brought pursuant to Section 1981 are governed by the same evidentiary framework as claims brought under Title VII; that is, in the absence of direct evidence of discrimination,[15] the court applies the burden-shifting scheme of *McDonnell Douglas Corp. v. Green*[16] and *Texas Department of Community Affairs v. Burdine*.[17] Under this framework, plaintiff must first prove a prima facie case of discrimination.[18] If plaintiff is able to sustain this burden, the burden of production shifts to defendant to "articulate a legitimate, nondiscriminatory reason for rejection."[19] If defendant sustains that burden, the burden of production shifts back to plaintiff to show that defendant's proffered reason for rejection is false, or merely a pretext, and the presumption of discrimination created by establishing a prima facie case "drops out of the picture."[20] Although the burden of production shifts back and forth between the parties, the ultimate burden of persuasion remains at all times with the plaintiff.[21]

### A.   *Race and National Origin Discrimination Claim*

---

[14] 42 U.S.C. § 1981(a).

[15] Here plaintiff does not appear to argue that direct evidence of race discrimination is present, as she advocates the *McDonnell-Douglas* burden-shifting framework in the Pretrial Order.

[16] 411 U.S. 792 (1973).

[17] 450 U.S. 248 (1981); *see Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006); *Maldonado v. City of Altus*, 433 F.3d 1294, 1307 (10th Cir. 2006); *Black Educ. Network, Inc. v. AT & T Broadband, LLC*, 154 F. App'x 33, 44 (10th Cir. 2005); *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004).

[18] *See Burdine*, 450 U.S. at 252–53; *McDonnell Douglas Corp.*, 411 U.S. at 802.

[19] *See McDonnell Douglas Corp.*, 411 U.S. at 802.

[20] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).

[21] *Burdine*, 450 U.S. at 253.

### 1.     Prima Facie Case

To state a prima facie case of race and national origin discrimination in the termination context, plaintiff must show that she: (1) belonged to a protected class; (2) was qualified for her position; (3) was discharged; and (4) her position was not eliminated after her discharge.[22]  Only the second element of plaintiff's prima facie case is at issue, that she was qualified for her position.

A plaintiff may show that she is qualified for purposes of the prima facie case "by her own testimony that her work was satisfactory, even when disputed by her employer, or by evidence that she had held her position for a significant period of time."[23]  Plaintiff testified during her deposition that her job as a GI Tech required her to be on her feet when assisting with an ERCP.[24]  Accordingly, the Hospital argues that plaintiff's job duties, as described by her, required her to remain standing and assisting throughout an ERCP procedure; a duty she failed on December 14, 2006.  Moreover, the Hospital asserts that plaintiff had not held her position for a significant time period, but rather for a span of months while on probationary status.

The Tenth Circuit has held "that a defendant cannot defeat a plaintiff's prima facie case by articulating the reasons for the adverse employment action . . . ."[25]  Indeed, to hold otherwise would effectively deny the plaintiff "the opportunity to show that the reasons advanced by the

---

[22]*Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005).

[23]*Nguyen v. Gambro BCT, Inc.*, 242 F. App'x 483, 488 (10th Cir. 2007) (quoting *Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1470 (10th Cir. 1992)).

[24]*See* Doc. 32, Ex. A at 43–47.

[25]*EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1192 (10th Cir. 2000) (citing *MacDonald v. E. Wyo. Mental Health Ctr.*, 941 F.2d 1115, 1119–20 (10th Cir. 1991)).

defendant were pretextual."[26]  Furthermore, the evidence does not support defendant's argument that plaintiff was not qualified for her position as GI Tech, as it does not support the contention that she was unable to stand for long periods of time.  The evidence merely supports defendant's argument that she did not perform one of her job functions, not necessarily that she was unable to do so.  Given the non-burdensome requirements for making a prima facie showing,[27] the Court finds that plaintiff has sustained her "slight" burden of proof to establish that she was qualified for the GI Tech position.

### 2.     Legitimate, Nonretaliatory Reason for Termination

Having established her prima facie case, the burden under *McDonnell Douglas* shifts to defendant to demonstrate a legitimate, nonretaliatory reason for its termination decision.[28]  Defendant asserts that it terminated plaintiff due to her failure to adhere to the company policy requiring employees to put forth their best efforts while at work.  The Court finds that defendant has articulated a legitimate, nonretaliatory reason for terminating plaintiff's employment.

### 3.     Pretext

To defeat summary judgment, plaintiff must show that there is a genuine dispute of material fact as to whether defendant's explanations for terminating her employment are pretextual.[29]  To raise a fact issue of pretext, plaintiff must present evidence of temporal proximity plus circumstantial evidence of retaliatory motive.[30]  A plaintiff can show pretext by

---

[26]*Id.*

[27]*See, e.g.*, *Nguyen.*, 242 F. App'x at 489 (citing *Ortiz v. Norton*, 254 F.3d 889, 895 (10th Cir. 2001)).

[28]*See, e.g.*, *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135 (10th Cir. 2003).

[29]*Id.* (citing *Mickelson v. New York Life Ins. Co.* 460 F.3d 1304, 1318 (10th Cir. 2006)).

[30]*Id.* (citing *Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1206-07 (10th Cir. 2000)).

pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[31]  While this burden is not onerous . . . it is also not empty or perfunctory."[32]  A plaintiff typically makes a showing of pretext in one of three ways: (1) evidence that defendant's stated reason for the adverse employment action was false, *i.e.* unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting plaintiff.[33]

In this case, plaintiff relies on the following pieces of circumstantial evidence to demonstrate pretext: (1) defendant's witnesses have painted an incoherent and inconsistent portrait of the alleged business justification for plaintiff's termination; (2) differing treatment of similarly-situated individuals; and (3) contradictory evidence about the identity of the decision-maker.  The Court discusses each in turn.

First, plaintiff contends that the Hospital employees' business justification for plaintiff's termination has been incoherent and inconsistent.  Plaintiff points to Wyatt's testimony that he was unaware of an express written policy that forbids sleeping while on duty and that it was not prohibited when an employee was on break from their active employment duties.[34]  Because plaintiff believed herself to be on a break when she was allegedly sleeping, she argues that she

---

[31]*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).

[32]*Id.* at 1323-24.

[33]*Kendrick v. Penske Transp. Servs, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

[34](Doc. 35, Ex. F at 15, 17.)

would not have been subject to automatic discharge. Plaintiff also points to Darrah's testimony that she relieved plaintiff during the ERCP procedure before she observed plaintiff sleeping.

Plaintiff initially suggests that sleeping while on duty would not warrant termination under Hospital policy, pointing to Wyatt's testimony. But Wyatt merely testified that he was unaware of an express, written policy. Stanton, who is the Employee Relations Coordinator for the Hospital, affirmed that "the Hospital has the practice of terminating employees on the first offense for sleeping during work time. All employees, of whom management was aware, who have been caught sleeping during work time in the Gastrointestinal/Endoscopy lab have been terminated."[35] Stanton's affidavit does not state that there was a written policy, but that the Hospital had a practice of terminating employees for this type of infraction on a first offense.[36] This evidence is not controverted by Wyatt's testimony, nor any other evidence submitted by plaintiff.

Moreover, the fact that Darrah relieved plaintiff before she fell asleep does not suggest pretext. Initially, even though Darrah relieved plaintiff, there is no evidence that she directed plaintiff to move to the adjoining room and sit down for the remainder of the ECRP procedure. Darrah's testimony supports the nondiscriminatory reason for plaintiff's termination—that she did not use her "best efforts" while at work to comply with Hospital policies and procedures. To the extent plaintiff suggests that she was on break during the time she was allegedly sleeping, the only evidence to support this contention is her own testimony that she was on break. But a

---

[35](Doc. 32, Ex. B ¶ 17.)

[36]Notably, plaintiff fails to explain how a lack of a written policy prohibiting sleeping on the job renders this reason for plaintiff's termination discriminatory.

defendant need not show that its stated reason for termination was wise, fair, or correct.[37] Rather, the test is whether the employer had a good faith belief in its proffered non-discriminatory reason for termination.[38]  Here, if the Hospital believed Darrah's and Bohling's allegations that plaintiff was sleeping while she was supposed to be assisting with the ERCP and terminated plaintiff for that reason, then its belief would not be pretextual, even if it later turned out to be wrong.[39]  The evidence is uncontroverted that both Stanton and Schuttig believed plaintiff was sleeping when she was supposed to be assisting a medical procedure, not while she was on a break.  They premised this good-faith belief on the written statements of both Bohling and Darrah.  Accordingly, plaintiff's testimony that she was not sleeping and that she was on break at the time does not establish pretext.[40]

Next, plaintiff suggests that similarly-situated individuals were treated differently.  A plaintiff may show pretext by proving that similarly situated nonprotected individuals were treated more favorably for committing comparable conduct.[41]  "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."[42]  First, plaintiff suggests that Darrah and Bohling, who are White and American, should have been disciplined under the Hospital's policy for failing to

---

[37]*Young v. Dillon Cos.*, 468 F.3d 1243, 1250–51 (10th Cir. 2006); *Rivera v. City & County of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004); *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998).

[38]*Hardy v. S.F. Phosphates Ltd.*, 185 F.3d 1076, 1080 (10th Cir. 1999); *McKnight*, 149 F.3d at 1129.

[39]*See McKnight*, 149 F.3d at 1129.

[40]*See Oglesby v. Hy-Vee, Inc.*, 214 Fed. App'x 829, 835 (10th Cir. 2007) (finding that a lack of conclusive evidence that plaintiff had indeed gone to sleep on the job is not dispositive where the decisionmaker was presented with circumstantial evidence that plaintiff was sleeping).

[41]*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000).

[42]*Rivera v. City & County of Denver*, 365 F.3d 912, 922-23 (10th Cir. 2004) (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir.1997) (internal quotation marks omitted)).

awaken plaintiff when they observed her sleeping. The Court agrees with defendant that these nurses were not similarly situated individuals who committed comparable conduct. Even if the Court assumes that these employees dealt with the same supervisor and were subject to the same standards, it is clear that they did not engage in comparable conduct. Plaintiff is unable to point to any evidence that the Hospital has a policy of terminating employees who fail to wake other sleeping employees during a medical procedure. Further, these nurses were in the middle of a medical procedure when they observed plaintiff in the neighboring room sleeping. Surely, they were not required to leave the procedure that they were assisting in order to awaken plaintiff. It is uncontroverted that both nurses reported their observations to Schuttig the next day. Plaintiff is unable to come forward with evidence that similarly situated individuals were not disciplined for sleeping on the job or other truly comparable conduct.[43]

Finally, plaintiff suggests that Schuttig's and Stanton's testimony contradicts one another about who the ultimate decision-maker was on plaintiff's termination. Schuttig testified that Stanton made the initial recommendation to terminate plaintiff and that Schuttig "wasn't asked for an opinion because it's KU policy." Stanton testified that she reviewed the documentation and talked to Schuttig about hospital policies and procedures that affected the decision, specifically, that "typically when somebody is sleeping on the job is a terminable offense on the first offense."[44] But Stanton denied that she made the ultimate decision to terminate plaintiff. Despite the fact that neither Stanton nor Schuttig would claim ultimate responsibility for the

---

[43]*See, e.g.*, *Montgomery v. Yellow Freight Sys., Inc.*, 671 F.2d 412, 413 (10th Cir. 1982); *Wright v. Pilgrim's Pride Corp.*, No. 04-CV-1116, 2007 WL 3101846, at *7 (W.D. Ark. Oct. 22, 2007) ("[plaintiff] has not produced any evidence showing that similarly situated Caucasian employees were treated differently than him when they were caught sleeping on the job.").

[44](Doc. 35, Ex. D at 8–9.)

decision to terminate plaintiff during their depositions, it is uncontroverted that they both at least played a role and participated in the decision. It is uncontroverted that they were both present during the meeting with plaintiff where she was terminated on December 19, 2006. Also, they both signed the Corrective Action Form that formally terminated plaintiff and explained the basis for her termination. While it is true that evidence of inconsistencies may establish pretext, it must go to the employer's proffered legitimate reason for the action it took, such that a reasonable factfinder could find the reason unworthy of belief.[45] Even if this Court presumes that Stanton's and Schuttig's testimony is inconsistent, it does not suggest that the reason for plaintiff's termination—sleeping on the job—is unworthy of belief, as both testified that this was the basis for her termination.

This is a case where summary judgment is appropriate because, "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or . . . the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination occurred."[46] Defendant's motion for summary judgment is therefore granted on plaintiff's Section 1981 and Title VII discrimination claims.

### B.     *Retaliation*

Plaintiff alleges that she was retaliated against for complaining of discrimination by Dr. Cooke. Like discrimination claims, the Court applies the three-part test established in *McDonnell Douglas* when evaluating retaliation claims under Title VII based on circumstantial

---

[45]*See, e.g.*, *Ogelsby*, 214 F. App'x. at 831.

[46]*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

evidence.[47]  To state a prima facie case of retaliation, plaintiff must show that: (1) she engaged in a protected activity; (2) defendant took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action.[48]  Defendant argues that plaintiff can point to no evidence that she engaged in a protected activity.  Protected activity, or opposition activity, is "an informal or formal complaint about, or other opposition to, an employer's practice or act . . . if the employee reasonably believes such an act to be in violation of the statute in question."[49]

The Court assumes for purposes of summary judgment that plaintiff can establish that she engaged in protected activity by informally complaining to Schuttig about her experiences with Dr. Cooke.  The remaining analysis under the *McDonnell Douglas* framework for plaintiff's retaliation claim is identical to her discrimination claim.  Therefore, for the reasons already discussed above, defendant is entitled to summary judgment on this claim as well.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion for Summary Judgment (Doc. 31) is **GRANTED**.

**IT IS SO ORDERED**.

Dated:  December 8, 2008

                                                                         S/ Julie A. Robinson
                                                                        JULIE A. ROBINSON
                                                                        UNITED STATES DISTRICT JUDGE

---

[47]*Vaughn v. Epworth Villa*, 537 F.3d 1147, 1150 (10th Cir. 2008).

[48]*Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006).

[49]*Jeseritz v. Potter*, 282 F.3d 542, 548 (8th Cir. 2002).